## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | **CRIMINAL ACTION** |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| **MATTHEW WILLIAMS** | : | **No. 15-471-3** |
| | : | |

## MEMORANDUM

PRATTER, J.                                                         AUGUST ⟋⟋, 2020

Defendant Matthew Williams seeks his immediate release from incarceration by moving

for a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A)(i). The primary basis for the

motion is the COVID-19 pandemic and attendant conditions relating to the pandemic as they may

affect this defendant, who suffers from asthma and obesity. The Government disputes the merits

of the motion. For the reasons that follow, the Court denies the motion.

### BACKGROUND

### I.   Mr. Williams' Criminal Conduct

On December 8, 2016, a jury convicted Mr. Williams of all three charges he faced in the

indictment: (1) conspiracy to distribute cocaine base ("crack") and heroin, in violation of 21 U.S.C.

§ 846 (Count One); (2) distribution of cocaine base ("crack"), in violation of 21 U.S.C. § 841(a)(1),

(b)(1)(C) (Count Four); and (3) possession of a firearm in furtherance of a drug trafficking crime,

in violation of 18 U.S.C. § 924(c)(1) (Count Eight).

At trial, the evidence established that Mr. Williams conspired with Koran Johnson and

Robert Gardner to distribute heroin and crack cocaine from November 18, 2014 to on or about

December 11, 2014. On four occasions, after emerging from two stash houses that the conspirators

controlled, each of the three men sold cocaine base to a confidential informant who was working

1

alongside law enforcement.  The stash houses were used to cook crack cocaine, bag crack cocaine and heroin, store firearms, store narcotics bagged for sale, and store proceeds of sales and narcotics.  When executing search warrants of these locations, officers recovered a substantial number of items, including firearms, heroine, crack cocaine, oxycodone tablets, cell phones, items covered in cocaine residue, a digital scale, United States currency, and a ballistic vest.  When executing a search warrant for one of the stash houses, the officers arrested Mr. Williams and later recovered a Beretta .40 caliber pistol, loaded with 14 live rounds, which Mr. Williams spontaneously admitted was his firearm.  In the Government's sentencing memorandum, it presented evidence of Mr. Williams' membership in the Greenway Gorillaz street gang, as well as his possible exercise of authority in that gang.

Taking into consideration the sentencing factors pursuant to 18 U.S.C. § 3553(a), the Court sentenced Mr. Williams to 90 months' imprisonment, to be followed by five years of supervised release.

Mr. Williams is serving his sentence at FCI Schuylkill with an anticipated release date of May 4, 2021.  Defense counsel states that Mr. Williams will be released on November 5, 2020 most likely to house arrest in a halfway house.[1]  He has a relatively minor criminal history and a low security designation in the Bureau of Prisons (BOP).  Mr. Williams has incurred two disciplinary infractions while serving his sentence, including his refusal to obey an order and participating in an unauthorized meeting.

## II.    Mr. Williams' Request for Compassionate Release and Medical Records

On April 27, 2020, Mr. Williams submitted a request for compassionate release to the warden of his facility.  Four days later, the warden denied his request.  The Court docketed a *pro*

---

[1]      Defense counsel made this representation in his letter dated July 20, 2020 to the Court.  The motion states that Mr. Williams' tentative house arrest date is November 4, 2020.

*se* letter Mr. Williams sent to the Court requesting compassionate release on June 9, 2020. Soon thereafter, Mr. Williams, through his counsel, submitted a formal motion for compassionate release. In the latter, Mr. Williams argues that he should be granted compassionate release due to his preexisting health conditions, his low security designation, his rehabilitative efforts, and his low criminal history score. Moreover, Mr. Williams points out that he has an approved reentry plan and, upon release, will be living at an identified address in Philadelphia.

Mr. Williams' medical records reflect that he has a documented history of bronchial asthma as well as a body mass index which fluctuates around 31.[2] Mr. Williams' most recent medical records show that he had a body mass index of 31.5 in September 2019. The medical records reveal that Mr. Williams' asthma is mild. He has been prescribed Albuterol, an inhaler which includes instructions that daily use of the medication is not necessary and that it should be used for two puffs by mouth four times a day as needed to prevent or relieve asthma attacks. Mr. Williams' medical records do not reflect any serious asthma symptoms or any asthma attacks. Overall, Mr. Williams' conditions appear well-controlled at this time with medication and medical guidance provided by the medical personnel at FCI Schuylkill. Mr. Williams is otherwise fully ambulatory and engages in all normal activities of daily living.

---

[2]     The medical records also reveal that Mr. Williams presents a prediabetes condition. The CDC has not identified prediabetes as increasing the risk of developing serious illness from COVID-19. *See United States v. Hazam*, No. 18-30029, 2020 WL 3265349, at *2 (C.D. Ill. June 17, 2020) (noting that the CDC does not recognize prediabetes as a comorbidity that may increase the risk of serious injury or death from COVID-19); *United States v. Mungin*, No. 97-1105, 2020 WL 2847927, at *3 (S.D.N.Y. June 2, 2020) (same).

### III.     Response to the COVID-19 Pandemic

Because "maintaining safety and security of [BOP] institutions is [BOP's] highest priority",[3] BOP has taken significant measures to protect the health of the inmates in its charge. BOP's Pandemic Influenza Plan has been in place since 2012. BOP HEALTH SERVICES DIVISION, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited Aug. 7, 2020).    The protocol set forth in this plan established a phased framework which requires BOP facilities to begin preparations in the face of a "[s]uspected human outbreak overseas." *Id.* at i.  This plan further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.  BOP began planning for potential transmissions related to COVID-19 as early as January, during the same time in which it established a working group to develop COVID-19 policies.  In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions on March 13, 2020.

Presently, BOP operations are governed by Phase Seven of the Action Plan.  The current modified operations plan in this phase requires all inmates in every BOP institution to be secured in their assigned cells or quarters as a means to stop any spread of the disease.  Only limited group gathering is permitted, with attention to social distancing efforts to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access.  BOP has also severely limited the movement of inmates and detainees among its facilities.  Exceptions exist only for medical treatment and similar exigencies.  Moreover, official staff travel has been cancelled, as has most staff training.  BOP is also endeavoring to regularly issue face masks to all staff and inmates and

---

[3]      BOP, *Updates to BOP COVID-19 Action Plan: Inmate Movement* (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited Aug. 7, 2020).

4

strongly encourages individuals to wear appropriate face coverings when in public areas when social distancing cannot be achieved.

Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the Centers for Disease Control and Prevention's (CDC) criteria for release from isolation. All facility staff are screened for symptoms in areas with sustained community transmission. Staff exhibiting a fever of higher than 100.4 degrees Fahrenheit are barred from entering the facility. Similarly, staff members exhibiting a stuffy or runny nose can be placed on leave. Only contractors performing essential services or the necessary maintenance on essential systems may access BOP facilities. Moreover, all volunteer visits have been suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer accessing BOP facilities will accordingly be screened for symptoms and risk factors. Legal visits will be permitted on a case-by-case basis only after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[4] Pursuant to the Coronavirus Aid, Relief, and Economic Security Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020,

---

[4]     This authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that have seen the greatest incidence of coronavirus transmission thus far.

Taken together, these measures are designed to mitigate the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices accordingly to maintain the safety or prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Thus far, BOP's efforts at FCI Schuylkill have been mostly successful. As of August 6, 2020, only one positive case of an inmate having COVID-19 has been reported, and no staff COVID-19 cases have been identified.[5] The inmate has been isolated while receiving any necessary treatment.

### LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). A defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf, which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A).[6]

---

[5]     Through its website, BOP provides current information about COVID-19 cases reported at all of its facilities. *See* BOP, *COVID-19 Coronavirus*, available at https://www.bop.gov/coronavirus/ (last visited Aug. 7, 2020).

[6]     Because the Court is satisfied that Mr. Williams has met the exhaustion requirement and because the Government does not raise an exhaustion argument, the Court need not focus on this requirement.

In the event the moving defendant complies with the exhaustion requirement, a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons warrant such a reduction, that the reduction is consistent with the Sentencing Commission's applicable policy statements,[7] and only after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable.  Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g).  U.S.S.G. § 1B1.13.2.

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the term.  The application note provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  U.S.S.G. § 1B1.13, cmt. n.(1)(A)(ii).  In order to find compelling and extraordinary reasons, the policy statement additionally requires a court to find that a defendant is "not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the

---

[7]     Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, No. 03-271, ___ F. Supp. 3d ___, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020).  Therefore, although the policy statement undoubtedly provides helpful guidance, it "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at *4.

defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *see also United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014)).

## DISCUSSION

Before addressing the arguments and the evidence, it bears recognizing the unprecedented magnitude of the COVID-19 pandemic. Indeed, to the extent correctional facilities may have successfully dealt with past viruses and outbreaks of communicable diseases, those diseases pale in scope with the apparent magnitude and speed of transmission of COVID-19 and the challenges associated with it. This virus comes in the form of a world-wide pandemic, resulting in a declaration of a national emergency and states of emergency by many states, along with various forms of business closures or modifications to operations and stay-at-home orders. Without known effective treatment at this time, and vaccines months (or more) away, public health officials urge people to practice "social distancing",[8] frequent and thorough hand-washing, avoidance of close contact with others, and wearing masks during public interactions—all of which are understandably difficult to implement in a correctional or detention facility. Certainly, the Court takes this critical health risk seriously. But as concerning as the common calamity of COVID-19

---

[8]     Some have understandably suggested that this would be better thought of as "physical distancing", insofar as it is also strongly urged that maintenance of social interaction remains important for purposes of counteracting the negative emotional aspects of isolation.

8

is, resolving Mr. Williams' motion still calls upon the Court to take into serious consideration the limits imposed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

Mr. Williams argues that he should be immediately released under 18 U.S.C. § 3582(c)(1)(A)(i) due to his preexisting health conditions, his low security designation, his rehabilitative efforts,[9] and his low criminal history score.

To be clear, the mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune individual, does not provide a basis for a sentence reduction on its own. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (holding that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread"); *see also United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (per curiam) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within out Circuit.").

The Government contends that Mr. Williams' asthma and obesity do not present extraordinary and compelling reasons justifying a reduction in his sentence. The Court agrees.

The CDC recognizes that "moderate to severe asthma" *may* pose a risk of an adverse outcome of COVID-19.[10] *See* CDC, *People with Moderate to Severe Asthma*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited Aug. 7, 2020). Pursuant to the National Asthma Education and Prevention Program, an individual suffers from moderate persistent asthma if any of the following is true:

---

9       Mr. Williams fails to support his claim that he has engaged in rehabilitative efforts while in prison with any evidence.

10      This is in contrast to a number of conditions that the CDC represents present a *definite* risk.

9

> Symptoms occur daily. Inhaled short-acting asthma medication is used every day.
>
> Symptoms interfere with daily activities.
>
> Nighttime symptoms occur more than 1 time a week, but do not happen every day.
>
> Lung function tests are abnormal (more than 60% to less than 80% of the expected value), and PEF [peak expiratory flow] varies more than 30% from morning to afternoon.

UNIVERSITY   OF   MICHIGAN,   *Classification   of   Asthma*,   available   at https://www.uofmhealth.org/health-library/hw161158 (last visited Aug. 7, 2020).

As is demonstrated by the medical records, there is an absence of documentation showing that Mr. Williams' condition meets the definition described above for moderate asthma. Rather, Mr. Williams' medical records show that his asthma appears to be well-controlled by the inhaler that BOP provided him. Moreover, the medical records do not reflect any serious asthma symptoms or asthma attacks. Accordingly, the Court finds that Mr. Williams' asthma does not present an extraordinary and compelling justification for his compassionate release. *See, e.g.*, *United States v. Slone*, No. 16-400, 2020 WL 3542196, at *6 (E.D. Pa. June 30, 2020) ("[A]n incarcerated person arguing extraordinary and compelling reasons based on asthma which is not moderate to severe is not entitled to compassionate release."); *United States v. Towel*, No. 17-519, 2020 WL 2992528, at *5 (E.D. Pa. June 4, 2020) (determining that mild, exercise-induced asthma that is well-controlled by the facility is not a factor which increases the risk for severe illness due to COVID-19).

Mr. Williams' current body mass index of 31.5 demonstrates that he presents the additional risk factor of obesity. The CDC very recently reduced the danger threshold for obesity from a

10

body mass index of 40 to one of 30.[11]  Mr. Williams' obesity is now considered a factor which

increases the risk of severe illness from COVID-19.  Even so, the fact that Mr. Williams suffers

from obesity during the age of the COVID-19 pandemic does not necessarily mean, on its own,

that extraordinary and compelling reasons justify the reduction of his sentence. *See United States*

*v. D'Ambrosio*, No. 15-3, 2020 WL 4260761, at **4-5 (M.D. Pa. July 24, 2020) (denying motion

to reduce sentence submitted by defendant concerned about the transmission of COVID-19 who

exhibited obesity and high blood pressure).[12]   Although the Court does not trivialize the

seriousness of Mr. Williams' health conditions, such ailments, coupled with the present conditions

at FCI Schuylkill, do not represent extraordinary and compelling reasons which justify a reduction

of his sentence.  The Court is confident that Mr. Williams' medical conditions are appropriately

managed at FCI Schuylkill, that the facility is engaged in strenuous efforts to protective inmates

against the spread of COVID-19, and that it would act to treat any inmate who does contract

COVID-19.  Accordingly, Mr. Williams has failed to present an extraordinary and compelling

reason allowing consideration for compassionate release.

Because Mr. Williams has failed to present any extraordinary and compelling justification

for his compassionate release, it is not necessary for the Court to advance to the next step of the

§ 3582(c)(1)(A)(i) inquiry by assessing the application of the § 3553(a) factors and possible danger

---

[11]   *See* CDC, *People with Certain Medical Conditions*, available at https://www.cdc.gov /coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal =https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2F groups-at-higher-risk.html (last visited Aug. 7, 2020).

[12]   In support of its opposition, the Government commented that Mr. Williams is teetering ever so slightly on the edge between exhibiting and not exhibiting the risk factor of obesity.  The Government points out that a weight fluctuation of only seven pounds would remove this risk factor from the Court's consideration.  In a letter dated July 20, 2020, defense counsel, ironically, shamed the Government for "fat sham[ing]" Mr. Williams.  The Court notes that the Government's acknowledgement of the undisputed fact that Mr. Williams is very much so on the low end of the obesity spectrum is an entirely appropriate, and certainly relevant, comment for the Government to make in defending against Mr. Williams' motion.

to the community imposed.   Thus, Mr. Williams' reliance on *United States v. Ladson*, No. 04-697-1, 2020 WL 3412574 (E.D. Pa. June 22, 2020) is inapposite.[13]   In that case, the Government and defendant agreed that the defendant's medical conditions warranted an extraordinary and compelling reason justifying release, but disputed whether his release would present a danger to the community as well as undermine goals of criminal sentencing. *Id.* at *1. Along similar lines, the Court also need not entertain Mr. Williams' dependence on the dicta via rhetorical questions in *United States v. Sotelo*, 2019 U.S. Dist. LEXIS 135051 (E.D. Pa. Aug. 8, 2019).[14]

Even if Mr. Williams had presented an extraordinary and compelling reason warranting his reduction in sentence, the Court's consideration of the § 3553(a) factors and possible danger to the community imposed would necessitate a denial of Mr. Williams' motion. Mr. Williams has failed to demonstrate how his release would appropriately reflect the seriousness of his offenses, promote respect for the law, and provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A).   Indeed, the seriousness of the offenses and Mr. Williams' willingness to use a shotgun in a residential neighborhood to protect his drug stash, as well as his membership in a violent street gang, demonstrates that he poses a danger to the community.

---

[13]   Although Mr. Williams did not cite *Ladson* in his motion, defense counsel submitted a copy of the memorandum opinion as an attachment to his letter dated July 20, 2020.

[14]   In any event, the observations set forth in *Sotelo*, which in part reflected upon "the low risk of recidivism for a first time offender with months to live" are inapplicable to the situation presented here. *Id.* at *35. Unlike the defendant in *Sotelo*, Mr. Williams has not been given a grave diagnosis that he will not live beyond six months.   Rather, Mr. Williams lives with a concern which is, unfortunately, yet understandably, on the minds of many Americans, incarcerated or otherwise.

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Williams' motion for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i).  An appropriate order follows.

BY THE COURT:

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**